E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Chief, Environmental and Community Safety Crimes Section
Assistant United States Attorney
MATTHEW O'BRIEN (Cal. Bar No. 261568)
Assistant United States Attorney
Environmental and Community Safety Crimes Section
ALIX MCKENNA (Cal. Bar. No. 295202)
Assistant United States Attorney
General Crimes Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-8644
     Facsimile: (213) 894-0141
     E-mail:    Matthew.O'Brien@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 23-CR-169-MEMF |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | Hearing Date: August 18, 2023<br>Hearing Time: 10:00 a.m. |
| MICHAEL BARZMAN, | Location:    Courtroom of the<br>              Hon. Maame Ewusi- |
| Defendant. | Mensah Frimpong |

       Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mark Williams, Matthew O'Brien, and Alix McKenna, hereby files its Sentencing Memorandum regarding defendant MICHAEL BARZMAN.

       This submission is based upon the attached memorandum of points and authorities, the Presentence Investigation Report and Recommendation Letter disclosed on July 13, 2023, the files and

records in this case, and such further evidence and argument as the Court may permit.

Dated: August 1, 2023                Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

         /s/
MARK WILLIAMS
MATTHEW O'BRIEN
ALIX MCKENNA
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

I.   INTRODUCTION....................................................1
II.  STATEMENT OF FACTS..............................................1
     A.   Defendant's Creation of Fake Basquiat Paintings...........1
     B.   Defendant's Invention of a False Provenance...............3
     C.   The Exhibition of the Fraudulent Painting at the
          Orlando Museum of Art.....................................4
     D.   The June 14, 2022 Interview and False Statements..........4
     E.   The August 18, 2022 Interview and False Statements........6
     F.   The October 13, 2022 Interview and False Statements.......6
     G.   The October 21, 2022 Interview and Admissions.............7
III. THE PSR........................................................7
IV.  THE GOVERNMENT'S SENTENCING RECOMMENDATION.....................8
     A.   The Nature and Circumstances of the Offense...............8
     B.   Defendant's History and Characteristics...................9
     C.   The Section 3553(a)(2) Factors...........................10
     D.   The Need to Minimize Sentencing Disparities..............10
V.   CONCLUSION....................................................11

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

On May 26, 2023, defendant MICHAEL BARZMAN ("defendant") pled guilty pursuant to a plea agreement to a single-count information, which charges him with making false statements in violation of 18 U.S.C. §1001.  In the factual basis of defendant's plea agreement, he admitted to making multiple false statements to FBI agents during interviews regarding his role in the creation of about two dozen paintings purportedly created by the celebrated artist, Jean-Michel Basquiat.  In truth, as defendant ultimately admitted, defendant and an associate had created the paintings, which eventually made their way into an exhibition at the Orlando Museum of Art in early 2022.

On July 13, 2023, the United States Probation Office issued a Presentence Investigation Report ("PSR") and Recommendation Letter for defendant.  The Probation Office found that defendant's total offense level is 4 and that he falls within Criminal History Category II, resulting in a Guidelines range of zero to six months.  The Probation Office recommended a sentence of three years' probation, 500 hours of community service, and a fine of $500.  The government has no objections to the PSR and concurs in the Probation Office's recommended sentence.

**II.   STATEMENT OF FACTS**

**A.   Defendant's Creation of Fake Basquiat Paintings**

In 2012, defendant and an associate, J.F., formed a plan to create drawings and paintings in the style of Basquiat and market the artworks for sale as if they were authentic works by Basquiat. Defendant and J.F. created a series of paintings and drawings designed to look like works by Basquiat (the "Fraudulent Paintings").

J.F. spent a maximum of 30 minutes on each image and as little as five minutes on others, and then gave them to defendant to sell on eBay.  Defendant and J.F. agreed to split the money that they made from selling the Fraudulent Paintings.  J.F. and defendant created approximately 20-30 artworks by using various art materials to create colorful images on cardboard.  After finishing the images, defendant and J.F. placed them outdoors to expose them to the elements and thus create an aged appearance consistent with works made in the 1980's when Basquiat was painting.  Defendant then sold the works and gave half of the profits to J.F.  (Dkt. No. 3 at 6:10-26; PSR ¶¶ 9, 10.)

The Fraudulent Paintings created by J.F. and/or defendant included the following works:

  

  




(Dkt. No. 3 at 7.)

**B.   Defendant's Invention of a False Provenance**

Provenance is the history of the ownership of a piece of artwork, beginning with the hand of the artist and continuing to the present owner of the artwork.  Establishing provenance is essential in determining if a piece of artwork is authentic.  Provenance documentation can include invoices, gallery records, gallery labels, documentation from an artist's foundation, estate, or authentication boards as examples.  Provenance records can also include auction records and records of exhibitions of artwork at museums and at other art exhibitions.  Artwork purported to be by an established artist with no provenance has less value than artwork by the same established artist which has an established provenance. (Dkt. No. 3 at 7:27-8:10; PSR ¶ 11.)

In 2012, during the time that defendant was creating the Fraudulent Paintings, he also worked as an auctioneer and ran a business called Mike Barzman Auctions that focused on purchasing and reselling the contents of unpaid storage units.  Defendant purchased the contents of a unit previously rented by a well-known

3

screenwriter, Thaddeus Mumford Jr. ("Mumford"). (Dkt. No. 3 at 8:11-16; PSR ¶ 12.)

Defendant used the acquisition of Mumford's stored items to create a false provenance for the Fraudulent Paintings. Defendant claimed that the Fraudulent Paintings were found inside Mumford's storage unit along with Mumford's other possessions. To bolster this false provenance, defendant gave buyers a ticket stub from a storage unit with locker number "2125," and told them that it had come from Mumford's locker. Defendant also provided a group of buyers with a notarized document affirming that the Fraudulent Paintings came from Mumford's storage unit. (Dkt. No. 3 at 8:17-25; PSR ¶ 12.)

### C. The Exhibition of the Fraudulent Painting at the Orlando Museum of Art

In February 2022, the Orlando Museum of Art opened an exhibit entitled "Heroes & Monsters: Jean-Michel Basquiat, the Thaddeus Mumford, Jr. Venice Collection" featuring 25 paintings purportedly by Basquiat. Most of the featured works had, in fact, been created by defendant and J.F. Defendant was aware of the exhibition and knew that he had created or co-created the majority of the featured works. The exhibition catalogue included an essay stating that some of the featured pieces had previously been kept in Mumford's storage locker. The essay also referenced a sworn statement from a "small-time Los Angeles auctioneer" (defendant) stating that defendant had purchased the contents of Mumford's locker, including paintings on cardboard. (Dkt. No. 3 at 8:27-9:10; PSR ¶ 13.)

### D. The June 14, 2022 Interview and False Statements

On June 14, 2022, FBI agents interviewed defendant. In the beginning of the interview, the agents cautioned defendant to be

4

honest because lying to an FBI agent can constitute a crime.  (Dkt. No. 3 at 9:12-15; PSR ¶ 14.)

Defendant told the agents that he had previously been in the business of buying the contents of storage lockers.  He claimed that approximately ten years prior to the interview, while working in the storage-locker purchasing business, he came across art that he thought "might have been" made by Basquiat, which he sold to "a couple of groups of people."  He told the agents that he sold the works as "in the manner of" Basquiat after seeking opinions on their authenticity and hearing from people that the works didn't look right or would be very hard to authenticate.  Defendant said that he had doubts as to the authenticity of the works but never told agents that he knew they were inauthentic.  (Dkt. No. 3 at 9:16-26; PSR ¶ 14.)

Defendant told the agents that he had purchased the contents of a storage unit belonging to Mumford, but that he did not know whether the artwork came from that unit and "never even thought that." Defendant told the agents that members of a group of buyers had contacted him for years and repeatedly asked him to sign paperwork saying that the works came from the Mumford storage unit.  Defendant told the agents that the buyers offered him $5,000 to sign documents authenticating the works.  (Dkt. No. 3 at 9:27-10:6; PSR ¶¶ 14-15.)

Agents showed defendant a notarized declaration signed by defendant stating that the paintings came from Mumford's storage unit.  Defendant claimed that he did not remember signing the document but said he might have.  (Dkt. No. 3 at 10:7-10; PSR ¶ 15.)

At the time of the interview, defendant knew that Basquiat did not create the Fraudulent Paintings.  Defendant knew that it was a lie to tell FBI agents that the works "might have been" by Basquiat,

5

because he and J.F. had actually created them. Defendant knew that his statements to the contrary were lies. (Dkt. No. 3 at 10:11-15; PSR ¶ 16.)

### E. The August 18, 2022 Interview and False Statements

On August 18, 2022, FBI agents again interviewed defendant. Again defendant was advised that if he made a knowing and willful false statement, it could subject him to criminal prosecution. (Dkt. No. 3 at 10:17-22; PSR ¶ 17.)

Defendant described selling paintings purportedly by Basquiat. When asked where the fake Basquiat paintings came from, defendant responded "I don't know, they could have come from a storage-locker. I think at the time, I was like almost 90 percent sure they did." When asked where he had acquired the paintings, defendant responded "either a storage-locker, an estate sale, a clear out, I don't know, I had a lot of stuff coming in, so I don't know." Defendant was asked "did somebody paint them for you?" Defendant responded "no." Defendant was asked whether he painted the works himself. He responded "no." (Dkt. No. 3 at 10:22-11:3; PSR ¶ 17.)

At the time of the interview, defendant knew that he and J.F. had created the paintings. His statements to the contrary were lies. (Dkt. No. 3 at 11:4-9; PSR ¶ 18.)

### F. The October 13, 2022 Interview and False Statements

On October 13, 2022, FBI agents again interviewed defendant. Again defendant was advised that lying to the agents would constitute a crime. Defendant admitted that he knew "it was a lie" that the artwork came from Mumford's storage-locker. Nevertheless, defendant still denied making the Fraudulent Paintings. (Dkt. No. 3 at 11:11-17; PSR ¶ 19.)

Agents showed defendant a label on the back of one of the Fraudulent Paintings. The painting was one of the items that defendant had sold, and that was later displayed in the Orlando Museum of Art. Agents pointed out that a shipping label bearing defendant's name and former address was attached to the cardboard on which the painting had been created. There was dried paint on top of the shipping label. Defendant claimed, falsely, that he had never seen the work and said that he had no idea how a shipping label bearing his information got on the back of it. Defendant falsely denied making the art and claimed that he could not think of anyone else who could have been involved in its creation. (Dkt. No. 3 at 11:18-12:8; PSR ¶¶ 20, 21.)

### G. The October 21, 2022 Interview and Admissions

When FBI agents again interviewed defendant on October 21, 2022, he finally admitted that he "lied about the entire thing" and that he "created the pieces" with his friend, J.F. Defendant admitted to signing a notarized document for a group of buyers stating that the Fraudulent Paintings came from Mumford's storage unit bearing unit number 2125. He told agents that he signed the document and had it notarized after one of the buyers offered him $10,000 or 15,000 to sign the paperwork. (Dkt. No. 3 at 12:10-19; PSR ¶ 22.)

## III. THE PSR

The PSR calculated defendant's total offense level as follows:

| Base Offense Level: | U.S.S.G. § 2B1.1 | 6 |
|---|---|---|
| Enhancements: | | |
| Acceptance of Responsibility | U.S.S.G. § 3E1.1(a) | -2 |
| **Total Offense Level:** | | **4** |

(PSR ¶¶ 30-38.)

7

The Probation Office determined that defendant fits within Criminal History Category II.  (PSR ¶ 44.)  Accordingly, the Probation Office calculated that defendant's Guidelines range is zero to six months.  (PSR ¶ 81.)  In its recommendation letter, the Probation Office recommended a sentence of three years' probation, 500 hours of community service, and a fine of $500.  (Dkt. No. 25.)

The government concurs with the PSR's Guidelines calculations and has no objections to the PSR.

**IV. THE GOVERNMENT'S SENTENCING RECOMMENDATION**

The government concurs with the Probation Office and respectfully recommends a sentence of a sentence of three years' probation, (with each of the probationary conditions recommended by the Probation Office), 500 hours of community service, and a fine of $500.

### A. The Nature and Circumstances of the Offense

This was a serious offense.  On multiple occasions, defendant lied to federal agents about his scheme.  Defendant should have known better:  at each meeting with the FBI agents, defendant (represented by counsel) was warned about the criminal consequences of lying to the agents, yet he kept lying about his central role in the scheme. Even when defendant was confronted with a "smoking gun" – his name on a Federal Express label underneath the paint on one of the artworks – defendant kept lying.  It was not until his fourth interview with the government that defendant finally came clean.

As defendant admits, his lies to the FBI were material. Defendant's refusal to admit that he was the one who created the Fraudulent Paintings misled agents, wasted investigative resources, and necessitated multiple follow-up interviews.

While defendant was not charged with creating the Fraudulent Paintings, or creating the false documentation regarding their provenance, he bears responsibility for that relevant conduct. Likewise, while defendant did not play an active role in the Orlando Museum of Art's decision to showcase the Fraudulent Paintings, the fraudulent exhibition never would have happened but for defendant's deceptions. Moreover, defendant could have contacted the Orlando Museum of Art (or the FBI) once he learned of the exhibition, but he chose not to, which enabled the fraud to continue.

The FBI's investigation of the Fraudulent Paintings has been a high-profile undertaking, resulting in the seizure of the Fraudulent Paintings and substantial publicity.[1] Defendant, as one of the two instigators of the long-running scheme, deserves punishment.

### B. Defendant's History and Characteristics

Defendant's history and characteristics are both aggravating and mitigating. On the one hand, defendant has a criminal record including a serious conviction involving a threat of violence (PSR ¶ 45) as well as a worrisome arrest (PSR ¶ 47).

On the other hand, defendant undeniably has had a difficult life, physically and emotionally. (PSR ¶¶ 50-64.) Defendant's struggles with substance abuse and financial difficulties likely contributed to some of the unfortunate decisions he made regarding the Fraudulent Paintings. To be clear: were it not for defendant's physical problems and mental health issues, the government would be seeking a prison sentence here. The government considers the

---

[1] See, e.g., https://www.nytimes.com/2022/05/29/arts/design/fbi-basquiat-paintings-orlando-museum.html.

9

recommended 500 hours of community service to be an appropriate substitute for incarceration given defendant's unique circumstances.

### C. The Section 3553(a)(2) Factors

Pursuant to Section 3553(a)(2), the recommended sentence would reflect the seriousness of the offenses, promote respect for the law, provide just punishment for the offenses, afford adequate deterrence to criminal conduct, and protect the public from further crimes by defendant.

The recommended sentence would accomplish each of these objectives. In the government's view, defendant presents a low risk of recidivism, assuming he can address his mental health issues. The treatment defendant will undergo while on probation, combined with the 500 hours of community service, will protect (and provide benefits to) the public, while deterring against future criminal conduct.

### D. The Need to Minimize Sentencing Disparities

A sentence within the Guidelines typically minimizes the risk of sentencing unwarranted disparities. Here, the government is recommending a sentence within the Guidelines.

//
//
//

**V.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to three years' probation (with each of the probationary conditions recommended by the Probation Office), 500 hours of community service, and a fine of $500.

Dated: August 1, 2023            Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

          /s/
MARK WILLIAMS
MATTHEW O'BRIEN
ALIX MCKENNA
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA